**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:11-cv-382-FDW**

| | | |
|---|---|---|
| **FELIPE JESUS MADRIGAL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion under 28, United States Code, Section 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, (Doc. No. 1), as well as Respondent's Response in Opposition to the Motion, (Doc. No. 11).

**I.     BACKGROUND**

On April 30, 2003, the Grand Jury for the Western District of North Carolina returned a one-count Bill of Indictment, charging Felipe Jesus Madrigal ("Petitioner") with conspiracy to possess with the intent to distribute quantities of both cocaine and marijuana in violation of Title 21, United States Code, Sections 846 and 841(a)(l). (Crim. No. 3:03-cr-70, Doc. No. 13). On July 2, 2003, the Government filed an Information pursuant to 21 U.S.C. § 841(a)(1), declaring that the conspiracy offense involved at least five kilograms of cocaine and in excess of 1000 kilograms of marijuana. (Id., Doc. No. 67).

In July 2004 the Government sent a plea agreement to Petitioner through his attorney, stating that the statutory, mandatory minimum sentence faced by Petitioner would be no fewer than ten years and no more than life in prison. (Id., Doc. No. 225: Plea Agreement ¶ 2). The

Government offered several reductions for substantial assistance and timeliness of the plea. (Id. at ¶ 5). Thereafter, Petitioner entered into the plea agreement with the Government in which he agreed to plead guilty to the conspiracy offense, and also agreed that he was responsible for at least 5 kilograms but less than 15 kilograms of cocaine and at least 400 kilograms but less than 700 kilograms of marijuana. (Id.). Significantly, as part of the plea agreement, Petitioner acknowledged that the "statutory minimum and maximum sentences" for Count One was "no fewer than 10 years and no more than LIFE . . . imprisonment, or both." (Id. at ¶ 2).

The plea agreement also contained numerous other provisions critical to the allegations in Petitioner's Section 2255 Motion. First, Petitioner explicitly waived any rights he had under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). (Id. at ¶ 18). Petitioner also warranted that he had discussed with counsel any issues that impacted the "desirability [of] entering into his Plea Agreement." (Id.). Finally, the plea agreement provided that "[t]here [were] no agreements, representations, or understandings between the parties in this case, other than those that [were] explicitly set forth in the Plea Agreement and none [would] be entered into unless executed in writing and signed by all the parties." (Id. at ¶ 23).

On August 6, 2004, Magistrate Judge David C. Keesler conducted a plea colloquy pursuant to Federal Rule of Criminal Procedure 11 to ensure that Petitioner's guilty plea was knowing and voluntary. (Id., Doc. No. 476). During the hearing, the Court explained the nature of the count to which Petitioner was pleading guilty, explaining that Petitioner was charged with conspiring "to possess with intent to distribute a quantity of cocaine . . . and a quantity of marijuana." (Id. at 5). Judge Keesler also explained that it was further alleged that "the offense

involved at least five kilograms or more of a mixture and substance containing cocaine" and "at least 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana." (Id.). Finally, Judge Keesler explained that the plea agreement indicated that "the maximum penalty . . . [was] not less than ten years nor more than life imprisonment, a $4 million fine or both." (Id. at 6).

Petitioner told the Court that he had been over the charges carefully with his attorneys, and Petitioner's counsel stated that he believed that Petitioner understood the charges and the maximum penalties. (Id. at 7; 14-15). Petitioner admitted he was guilty of the offense to which he was pleading guilty. (Id. at 10). The Government then summarized the plea agreement to Petitioner, stating:

> [D]efendant is pleading guilty to Count One as Your Honor has already covered. He's aware [that] the maximum penalty is life. And there is a mandatory minimum of ten years and $4 million fine, or both fine and imprisonment. There are certain stipulations between the parties. They included that the amount of cocaine that was known or [ ] reasonably foreseeable by the defendant was at least to five kilograms but less than 15 kilograms; amount of the marijuana was at least 400 kilograms but less than 700 kilograms . . . . [I]n light of the cases of Apprendi vs New Jersey and Blakely v. Washington, he's waiving any rights he has to argue based on those cases, and that is spelled out in detail in the Plea Agreement.

(Id. at 10-11).

Petitioner responded affirmatively when the Court asked if he understood the terms of his plea agreement. (Id. at 11). The Court specifically inquired as to Petitioner's understanding of the Apprendi and Blakely waivers:

> THE COURT: Now, you're waiving certain rights you have pursuant to the cases after Apprendi vs. New Jersey and Blakely [vs.] Washington, and these rights include the rights to have facts that are essential to the determination of punishment charged in the indictment, proven to a jury and/or proven beyond a reasonable doubt. Do you understand that?
>
> DEFENDANT MADRIGAL: Yes, sir.

>THE COURT: Do you also understand that based on your <u>Blakely</u> waiver, the sentencing judge will determine your sentence pursuant on the Sentencing Guidelines, and in doing so, he can use any reliable information that he finds by a preponderance of the evidence?
>
>DEFENDANT MADRIGAL: I understand that.

(<u>Id.</u> at 12-13). Next, the Court inquired about the performance of defense counsel and whether Petitioner had any more questions:

>THE COURT: Are you satisfied with the services of your attorney in this case?
>
>DEFENDANT MADRIGAL: Yes, sir.
>
>THE COURT: Is there anything you'd like to say at this time about the services of your attorney?
>
>DEFENDANT MADRIGAL: No.
>
>THE COURT: Have you heard and understood all parts of this proceeding, and do you still wish to plead guilty?
>
>DEFENDANT MADRIGAL: Yes.
>
>THE COURT: Do you have any questions or statements you'd like to make at this time?
>
>DEFENDANT MADRIGAL: No.

(<u>Id.</u> at 14). Based on Petitioner's responses during the Rule 11 proceeding, Judge Keesler accepted Petitioner's plea, finding that Petitioner's guilty plea was "knowingly and voluntarily made and that [Petitioner] understands the charges, potential penalties and consequences of his plea." (<u>Id.</u> at 15).

On November 29, 2004, the United States Probation Office prepared its first Presentence Investigation Report ("PSR"), which substantially adopted the stipulations in the plea agreement and identified that Petitioner qualified for the safety valve. <u>See</u> (<u>Id.</u>, Doc. No. 462). The PSR

identified a prior arrest in the Middle District of North Carolina ("Middle District") stemming from passport fraud.[1] See (Id., Doc. No. 477 at 8). In that case, Petitioner was released after twenty days on unsecured bond, and a gentlemen's agreement was entered into between AUSA Zolot (the AUSA then assigned to the case), the State Department agent in Greensboro (arresting officer for the passport fraud), and Henderson Hill (Petitioner's counsel) regarding prosecution in the Middle District.[2] (Id. at 8). Specifically, the parties agreed that the Greensboro agent would not seek prosecution in the Middle District–thus preserving Petitioner's safety valve eligibility–as long as Petitioner was sentenced within the guidelines for his Western District offenses. (Id.). However, sentencing was delayed almost five years due to Petitioner's extenuating family circumstances. See (Crim. No. 3:03-cr-70, Orders dated 2/18/05, 5/9/05, 2/22/06, 6/8/07, and 10/17/07). For reasons not fully known, on May 13, 2008, Petitioner was arrested for passport fraud, pleaded guilty, and served over nine months in the Middle District. See (Id., Doc. Nos. 462; 477 at 8-13). On December 10, 2009, the U.S. Probation Office completed a revised PSR wherein the Middle District conviction was noted and Petitioner's safety valve eligibility was removed. See (Id., Doc. No. 462 at ¶ 32). The revised PSR recommended a total offense level of 29, yielding a preliminary Sentencing Guidelines range of imprisonment of 97-121 months based on criminal history category II, a statutory mandatory minimum of 120 months, and a Guidelines range, as restricted by the mandatory minimum of 120-21 months.[3] (Id. at ¶ 52).

This Court conducted Petitioner's sentencing hearing on December 16, 2009. During the

---

[1] The passport fraud arrest in the Middle District was the subject of the Government, Petitioner, and the State Department agent's gentlemen's agreement to forego prosecution in the Middle District.

[2] AUSA Zolot did not enter into any formal agreement that bound the Government. (Id., Doc. No. 477 at 9).

[3] According to the original PSR prepared on November 29, 2004, Petitioner's total offense level was 27, a criminal history Category I, yielding a recommendation of 70-87 months. (Id., Doc. No. 282).

sentencing hearing, Petitioner affirmed that the answers he had given during his Rule 11 hearing were true and correct, and this Court found that Petitioner knowingly and voluntarily pled guilty with an understanding of the charges, possible penalties, and consequences. See (Id., Doc. No. 477 at 4). In making this finding, this Court twice asked if Petitioner was "guilty of the crime of conspiracy to possess with the intent to distribute cocaine and marijuana," to which the Petitioner replied twice in the affirmative. (Id.). The Court accepted the PSR as its factual basis for Petitioner's guilty plea and found, based on an offense level of 29 and a criminal history category of II, that Petitioner was subject to an advisory Guidelines imprisonment range of 120-121 months. (Id. at 6).

The Government then made a motion for a downward departure pursuant to 18 U.S.C. § 3553(e) on the basis of Petitioner's substantial assistance to the Government, enabling this Court to impose a sentence below the mandatory minimum sentence. (Id. at 6-7). The Government then explained the long history of this case, detailing Petitioner's difficult family issues causing years of continuances, Petitioner's acceptance of responsibility and several attempts to cooperate, and finally the confusion in the Middle District resulting in Petitioner's loss of safety valve eligibility. (See generally id.). The Government requested that Petitioner receive the benefit of the failed gentlemen's agreement in the Middle District.[4] (Id. at 11). The gravamen of the Government's position was that the safety valve ineligibility was not due to post-agreement misconduct but, rather, miscommunications over an extensive period of time that derived from Petitioner's extenuating circumstances.

The Court granted the Government's Section 3553(e) motion and heard arguments from

---

[4] Petitioner would have an advisory guideline range of 70-87 months if the original gentleman's agreement had been honored.

both of Petitioner's attorneys regarding sentencing. (Id. at 13). Attorney Jacob Sussman, the first of Petitioner's attorneys to speak, discussed Petitioner's sick wife and how Petitioner had spent "essentially . . . his entire time with his wife as she went through [her ordeal]." (Id. at 14). Sussman went on to direct the Court's attention to Petitioner's Sentencing Memorandum submitted on February 16, 2006, and Petitioner's "extraordinary family obligations and responsibilities." (Id. at 15). These arguments were consistent with Petitioner's Sentencing Memorandum,[5] in which counsel argued for a downward departure based on (1) Petitioner's debriefing, acceptance of responsibility, and timeliness of plea; (2) Petitioner's family obligations and responsibilities to his sick wife and young children; (3) Petitioner's financial obligations to his family; and Petitioner's deportable alien status. See (Id., Doc. No. 410 at 6; 9; 12). Sussman then deferred to counsel Hill for the remainder of the argument. (Id., Doc. No. 477). Hill discussed the positive role model that Petitioner was in his community and home. (Id. at 18). Hill also noted that "because of the immigration issues, [Petitioner's] return to Raeford is not a practical thing." (Id.). After Petitioner's attorneys had concluded with their arguments, the Court honored the gentlemen's agreement and imposed a sentence of 70 months to run concurrently with the term of imprisonment Petitioner had already served in the Middle District. (Id. at 30).

Petitioner filed a notice of appeal on January 20, 2010. (Id., Doc. No. 467). Petitioner's appellate counsel filed an Anders brief, but questioned whether Petitioner's guilty plea was knowing and voluntary and whether trial counsel was ineffective. On April 11, 2011, the Fourth Circuit Court of Appeals held, inter alia, that Petitioner's plea was knowing and voluntary and

---

[5] Petitioner's conviction in the Middle District invalidated Petitioner's safety valve eligibility as argued in the memorandum. See (Id., Doc. No. 410).

counsel's effectiveness was not cognizable on direct appeal.  United States v. Madrigal, 422 Fed. App'x 278, 279-80 (4th Cir. 2011).  Petitioner then filed the instant motion to vacate his sentence pursuant to 28 U.S.C. § 2255 on August 5, 2011.  (Doc. No. 1).  In his motion, Petitioner alleges that Hill provided ineffective assistance of counsel.  In particular, Petitioner alleges that Hill failed to clarify "ambiguous" drug quantities contained in the plea agreement, which resulted in Petitioner being held responsible for drug quantities he never actually handled.  Petitioner further asserts that Hill's conduct resulted in Petitioner's passport fraud conviction in the Middle District, thus resulting in a deprivation of Petitioner's safety valve eligibility.  Finally, Petitioner claims that during sentencing Hill failed to argue that Petitioner should receive downward departures for loss of financial support for his family and his deportable-alien status.

## II.     STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief.  After having considered the record in this matter and the Response from the Government, the Court finds that this matter can be resolved without an evidentiary hearing.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.

See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

      1. Counsel's Failure To Explain Ambiguities in the Plea Agreement

Petitioner first asserts that counsel was ineffective because he failed to clarify purported ambiguities contained in the plea agreement, such as the conspiracy charge, and that Petitioner would not have pleaded guilty but for this misunderstanding. Petitioner frames his claim for ineffective assistance of counsel as an attack on the knowing and voluntary nature of Petitioner's plea agreement. This contention fails because Petitioner's allegations are contradicted by his sworn responses at his Rule 11 hearing. In addressing post-guilty plea claims of ineffective assistance of counsel, "statements previously made under oath, particularly those made during a Rule 11 proceeding which affirm an understanding of the proceedings and satisfaction with counsel, are deemed binding in the absence of '"clear and convincing evidence to the contrary."'" Ragin v. United States, No. 3:10-cv-276, 2010 WL 2723728, at *5 (W.D.N.C. July 8, 2010)

(Whitney, J., presiding) (quoting Fields v. Attorney Gen. of State of Md., 956 F.2d 1290, 1299 (4th Cir. 1992)). "Indeed, such statements constitute a formidable barrier to their subsequent attack." Id. at *5 (internal quotation marks omitted).

Thus, the Fourth Circuit has held that in the absence of extraordinary circumstances, allegations in a Section 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always "palpably incredible and patently frivolous or false." United States v. Lemaster, 403 F.3d 216, 222 (4th Cir. 2005) (citation omitted). The Lemaster Court's examples of an "extraordinary circumstance" are limited to an obviously and admittedly ineffective attorney whose performance rendered a plea involuntary, or a plea entered by an un-counseled defendant who provided documentary proof that he was both physically and mentally ill during the Rule 11 hearing. Id. at 221 (citing United States v. White, 366 F.3d 291, 300 (4th Cir. 2004) and Fontaine v. United States, 411 U.S. 213 (1973)). In a Section 2255 proceeding, unless the petitioner sufficiently proves the existence of extraordinary circumstances, "the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements. Otherwise, a primary virtue of Rule 11 colloquies would be eliminated–'permitting quick disposition of baseless collateral attacks.'" Lemaster, 403 F.3d at 221-22 (quoting Blackledge v. Allison, 431 U.S. 63, 79 n.19 (1977)).

Here, Petitioner affirmed during his Rule 11 hearing that he had reviewed the indictment, that he understood the charges and potential penalties, and that he had had sufficient time to

discuss his case and any possible defenses with counsel Hill.[6] Even assuming for the sake of argument that Hill misinformed Petitioner about the nature of his conspiracy liability, Judge Keesler correctly advised Petitioner of his liability for cocaine and marijuana, and Petitioner's acknowledgment that he understood these terms cured any alleged incorrect representations by Hill. Cf. United States v. Foster, 68 F.3d 86, 88 (4th Cir. 1995) (ruling that the defendant was not prejudiced by the attorney's assurances, where the defendant asserted that he would not have pled guilty if he had been informed he would be sentenced as a career offender); see also United States v. Craig, 985 F.2d 175, 179-80 (4th Cir. 1993) (finding that "mis-advice respecting sentencing possibilities" cannot be a "but for" cause of a guilty plea where the court correctly advised the defendant of the sentencing range). The record establishes, therefore, that even if Petitioner's counsel failed properly to advise him as to his responsibility for the quantities of cocaine and marijuana to which he stipulated in his plea agreement, he suffered no prejudice.

2. Counsel's Failure to Secure Safety Valve Eligibility

Petitioner next argues that counsel was ineffective because he failed to secure Petitioner's safety valve eligibility. This argument fails as a matter of law because Petitioner suffered no prejudice, as he received the full benefit of the safety valve due to the Court's granting of the Government's Section 3553(e) motion. As stated above, to establish the second prong of the Strickland analysis, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694 (emphasis added). Here, it is undisputed that Petitioner was eligible for the safety valve in November 2004. It is also undisputed that Petitioner became ineligible for

---

[6] Moreover, Petitioner reaffirmed his Rule 11 testimony before this Court. See (Crim. No. 3:03-cr-70, Doc. No. 477 at 2-5).

-11-

the safety valve after Petitioner was arrested and convicted of passport fraud in the Middle District. This changed is reflected in the initial and revised PSRs. Based on Petitioner's status in November 2004, the Probation Office calculated a guideline range of 70-87 months, with a statutory minimum sentence of 120 months, whereas in the revised PSR dated December 2009, the Probation Office calculated a guideline range of 97-121 months, with a statutory minimum sentence of 120 months.

At sentencing, however, the Government moved for a Section 3553(e) downward departure. The Court granted the motion, thereby empowering itself with the "authority to impose a sentence below a level established by statute as a minimum sentence." See 18 U.S.C. § 3553(e). After hearing arguments from Petitioner's counsel, the Court honored the gentleman's agreement, deviated from the statutory minimum, and imposed a sentence of 70 months, the bottom of the Guidelines range that applied under the safety valve. Therefore, at sentencing, Petitioner was placed in the exact position he would have been in if he had received the safety valve. Because Petitioner received the exact same benefit as his safety valve eligibility through the Court's granting of the Government's Section 3553(e) motion and subsequent sentence at the low end of the November 2004 PSR guideline range, Petitioner cannot demonstrate prejudice through the loss of his safety valve eligibility, and the Government is entitled to judgment as a matter of law as to this claim of ineffective assistance of counsel.

       3.       Counsel's Failure to Argue Downward Departures at Sentencing

Petitioner finally contends that counsel was ineffective because he failed to argue downward departures for loss of financial support pursuant to U.S.S.G. § 5K2.0 and a deportable alien's severity of confinement under Section 3553(a). This argument fails because, in fact, (1)

counsels Sussman and Hill discussed Petitioner's family circumstances, including his financial responsibilities and deportable-alien status, both at sentencing and in Petitioner's Sentencing Memorandum, and (2) the Court was well-apprised of Petitioner's circumstances when the Court imposed Petitioner's sentence. On February 16, 2006, Hill filed Petitioner's Sentencing Memorandum. See (Crim. No. 3:03-cr-70, Doc. No. 410). This memorandum extensively outlined Petitioner's "extraordinary family obligations and responsibilities," including the financial consequences that the family would suffer upon Petitioner's imprisonment. Moreover, it briefly discussed Petitioner's deportable-alien status. At sentencing, Sussman referred the Court to the memorandum before allowing Hill to advocate for Petitioner. Hill also referenced the arguments made in the memorandum and then proceeded to emphasize segments that he, as counsel, believed were the most effective for Petitioner's sentencing considerations. Hill focused his limited time on Petitioner's difficult family situation before highlighting Petitioner's deportable-alien status, and he concluded by asking the Court for leniency on behalf of Petitioner when exercising discretionary departures and variances. (Id., Doc. No. 477 at 18; 20). Most importantly, the Court highlighted several of Petitioner's Section 3553(a) factors, including Petitioner's deportable-alien status and Petitioner's support for his family. See (Id. at 26; 28; 29). Therefore, Petitioner cannot demonstrate that Hill failed to make the aforementioned downward departure arguments to the Court at sentencing, and the Government is entitled to judgment as a matter of law as to this final claim of ineffective assistance of counsel.

### IV. CONCLUSION

For the reasons stated herein, Petitioner's Motion to Vacate is denied.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: January 22, 2013

Frank D. Whitney
United States District Judge